DOWNING, APPELLANT, *v.* CRIPPEN ET AL., RESPONDENTS.

(No. 8322.)

(Submitted March 1, 1943. Decided May 10, 1943.)

[138 Pac. (2d) 575.]

438

*Mr. C. D. Borton* and *Mr. George W. Farr,* for Appellant, submitted a brief; *Mr. Farr* argued the cause orally.

*Mr. James T. Shea* and *Mr. C. H. Roberts,* appearing for Respondent *Dr. F. M. Knierim,* submitted a brief; *Mr. Shea* argued the cause orally.

*Mr. Thomas Dignan, Jr.,* for Respondents *C. E.* and *Gladys Crippen,* filed a brief and objections to petition for rehearing.

MR. JUSTICE ANDERSON delivered the opinion of the court.

The controversy presented by this appeal involves the foreclosure of a mechanic's lien on a building, separate from the land, with cross-complaint by one defendant seeking the foreclosure of a mortgage lien upon the same property.

F. D. Downing, the plaintiff, and his wife, Cora E. Downing, on October 1, 1938, sold a tourist camp property in the city of Glasgow, known as the Glasgow Tourist Camp, to E. C. Crippen and his wife, Gladys Crippen, on contract for $10,000, $1,000 thereof paid at the time of the agreement and the balance payable at $125 per month commencing May 1, 1939, with 10% interest, and deed of conveyance to be delivered when paid in full. The sale contract was in writing and was recorded, and the Crippens were given immediate possession.

Crippen wanted to make some building improvements in the spring of 1939 and arranged with Dr. F. M. Knierim for a loan of $1,500 for the purpose. To have an understanding of the terms and conditions of the loan, and the security for its repayment, a written agreement was made between Downing, Crippen and Dr. Knierim, which is spoken of as the tri-party agreement.

This agreement, dated March 31, 1939, refers to Crippen's purchase contract with Downing and provides that Dr. Knierim

shall loan Crippen the money for the improvements to be made; that he shall have the promissory note of Crippen and mortgage on the building and equipment as security, Downing waiving any paramount right of lien thereon for any of the purchase price under his sale contract with Crippen. After payment of the loan, the building and equipment, according to the contract, was to be considered part of the premises, subject to the full terms of the purchase contract between Downing and Crippen.

Dr. Knierim, contemporaneously with the tri-party agreement, advanced $1,000 of the loan, for which Crippen gave his note bearing 10% interest. No other security papers were made in connection with the loan, the tri-party agreement in itself being treated by all parties as a mortgage. There was an understanding that the balance would be advanced when needed —on completion of the building.

On April 11, Crippen contracted with Benzien and Sons for the building improvement contemplated, for $1,275. Extras brought this sum to $1,333 when the improvements were made. Other expenditures and equipment installed brought the total cost up to about $1,700 and Dr. Knierim, with the written assent of Downing, agreed to increase the loan by $200. Crippen paid part of the Benzien building contract debt, leaving $748 owing thereon when the work was completed on May 29, 1939.

Benzien and Sons made demand on Crippen and Dr. Knierim separately for the balance owing. Crippen, however, according to his own testimony and the testimony of Dr. Knierim, had made no demand or request for any further advance from Dr. Knierim. Instead, he called Downing urging him to come to Glasgow, telling him Benzien and Sons had filed lien. On June 5, Downing came to Glasgow and talked with Crippen—without seeing Dr. Knierim. There is conflict in the testimony as to what was said between Crippen and Downing in that conversation. Crippen and Dr. Knierim, defendants, both claim that by oral agreement there made, Crippen surrendered his purchase contract and turned back the tourist camp property to Downing, with Downing agreeing to pay all improvement debts incurred

by Crippen and remaining unpaid, including the mortgage debt to Dr. Knierim. This Downing denies, claiming that Crippen was discouraged and wanted to quit; that he laid the keys on the desk and said he was through; that he walked off and left Downing in possession. Downing says there was no agreement as to the building improvement debts.

Dr. Knierim came to the service station the next day, June 6, and found Downing in possession, at which he was surprised. He testified that Downing then told him he had taken over the station and tourist camp; that Crippen was out; that he owed Crippen nothing.

A few days after that and before June 10, Downing, Crippen and Dr. Knierim went to consult with attorney Weaver at his office. Crippen's testimony shows that the question of Dr. Knierim's failure to advance the balance of the money was discussed. Dr. Knierim gave as reason therefor that Downing had refused to assume payment thereof, acknowledging that he was supposed to advance the balance on the completion of the building, and stating that he was not going to advance any more until he was assured of repayment.

The record shows no further conference between the parties and nothing further done between them. Downing continued in possession of the tourist camp property and conducted the tourist camp business.

Benzien and Sons were not paid and, hearing that the lien would be foreclosed, Downing bought the claim and lien on August 2, 1939, taking assignment thereof. On September 18, he commenced this action.

The pleadings present the case as follows: By his complaint Downing sues as assignee of Benzien and Sons to foreclose the lien for labor and material in the construction of the building. The action is brought against Crippen and wife and Dr. Knierim as defendants. Crippen is alleged to be the owner of the building as personal property, with the mortgage thereon of Dr. Knierim, as under the tri-party agreement. The prayer is for foreclosure of the mechanic's lien as against Crippen's owner-

ship title and as superior to Dr. Knierim's mortgage lien, and for deficiency judgment against the Crippens.

Dr. Knierim appeared separately by answer to the complaint and, by cross-complaint against the Crippens and Downing, sought to foreclose his mortgage as a lien on the building superior to the mechanic's lien. He refers to the tri-party agreement and sets out the loan of $1,000 made by him to Crippen pursuant thereto, with the promissory note of Crippen given therefor, and the mortgage of the building as security. He sets up the later transaction of June 5, between Crippen and Downing, whereby Crippen surrendered his purchase contract and the property to Downing, including the mortgaged building, upon the agreement by Downing to pay the indebtedness secured by the mortgage. He alleges that he was not in default under the loan agreement at that time. The prayer is that plaintiff take nothing in the attempt to foreclose the mechanic's lien and that he have judgment against Downing and Crippen on the promissory note and for foreclosure of his mortgage as a first lien in satisfaction thereof, and for recovery of any deficiency as against both Downing and Crippen.

Crippen and his wife answered separately. They alleged that their purchase contract had been surrendered to Downing and the property re-delivered to him with the understanding and the agreement by him that he would pay the debts incurred in the improvement of the property, including the debt to Dr. Knierim. The prayer of their answer is that the plaintiff take nothing and that they have judgment requiring the plaintiff to pay the debt which they owe to Dr. Knierim.

Downing, by answer to the cross-complaint, sets up failure of consideration as a defense to the foreclosure of Dr. Knierim's mortgage, alleging he had failed fully to perform his agreement to lend money for the building improvements as contemplated under the tri-party agreement.

The case was tried to the court without jury, resulting in judgment for Dr. Knierim on his cross-complaint, foreclosing the mortgage as superior to the interests and claims of Crippen

and Downing, and for the recovery of any deficiency as against both Crippen and Downing, and denying any relief to Downing on his complaint for the foreclosure of the mechanic's lien. The Crippens were allowed $50 attorneys' fees as against plaintiff Downing.

The court made full findings of fact upon all the issues and with conclusions of law thereon, upon which judgment was rendered. The appeal is from the judgment.

In the mind of the trial court, as evidenced by its findings, ▮ the case turned on the agreement by Downing to pay the Crippen debts which had been incurred in improvement of the tourist camp property. The court found as a fact that, in consideration of the surrender to him of the Crippen purchase contract and the re-delivery to him of the property he had sold to Crippen, Downing agreed to pay these debts, including the indebtedness to Dr. Knierim. There was conflict in the testimony on that point, but, with substantial evidence for its support, the court's finding thereon should not be disturbed unless we should see a decided preponderance of evidence against the finding made, which is not the case here. (*Pope* v. *Alexander*, 36 Mont. 82, 90, 92 Pac. 203, 565; *Nolan* v. *Benninghoff*, 64 Mont. 68, 208 Pac. 905.) There is no greater reason to believe Downing's version than to believe Crippen's, as did the court, and there is nothing in the circumstances at the time nor in what thereafter transpired that would dictate a different conclusion than is found by the trial court.

The court found further that by taking re-delivery from ▮ Crippen of the tourist camp property, including the newly-erected building, and the surrender of the purchase contract, and by acquiring the Benzien lien, there was a merger of interests with the whole title of the building in question vested in Downing, subject only to Dr. Knierim's mortgage, and that because thereof Downing was estopped to assert any claim under the mechanic's lien as in any way paramount to the mortgage right of Dr. Knierim. The evidence amply sustains this finding and conclusion.

The question remains nevertheless whether the failure of Dr. ▆ Knierim to make the full amount of advance under the loan agreement was any defense to the foreclosure of the mortgage. Had Dr. Knierim refused to make the additional advance, it might have been a good defense. The evidence shows no such refusal on his part. He had advanced $1,000 of the loan immediately upon the tri-party loan agreement being made. There was an understanding he should make further advance of money as called for by Crippen and that no further advance would be needed until the building was completed. Upon completion of the building, Crippen made no demand for further advance, but instead thereof called Downing by telephone to come to Glasgow. Downing came and, without conferring with Dr. Knierim, by mutual agreement between them, Crippen surrendered his purchase contract and turned back the property to Downing. That was on June 5th. The following day, Dr. Knierim learned of the change upon coming to the service station and finding Downing in possession. Downing then told him that Crippen was out of the deal; that he had taken back the property; that he was in no way obligated to pay Dr. Knierim. Apparently, he took the inconsistent position that Dr. Knierim should, nevertheless, put up the additional money necessary to pay the Benzien lien. It was discussed a few days later in the conference at attorney Weaver's office. Dr. Knierim then offered to put up the money but required that Downing sign a note for it. This Downing refused to do and refused to obligate himself personally for the loan.

Under the tri-party agreement, Dr. Knierim was given mortgage security for the loan he was to make. Further, it was stipulated he should have the promisory note of Crippen for the money he so advanced. If Downing wanted the advance made to him, he would have to take it upon the same terms and conditions as would Crippen. He would have to give his note for it, which would be secured by the mortgage under the tri-party agreement. Since this he refused, he cannot complain because there was not the additional advance from Dr. Knierim. By

eliminating Crippen from the deal and by refusing to sign the note, Downing made it impossible for Dr. Knierim to go any further in the matter. Failure to make the full advance of the loan was therefore no defense to the foreclosure of the mortgage.

Downing's agreement to pay the Crippen debt is not void ■ under the statute of frauds for not being in writing. It is not a case of one agreeing to answer for the debt of another. Downing dealt with Crippen for the return of the property. In the transaction, he agreed to pay certain debts, including the Dr. Knierim debt. It was part of the consideration for the return of the property. Whether that consideration was paid direct to Crippen or to one of Crippen's creditors did not affect the nature of the agreement and the obligation assumed. It was an agreement to pay a certain amount of money for value received and was not an agreement to answer for the debt of another. The statute of frauds does not apply.

By the change in the situation of the parties, brought about by the surrender agreement between Crippen and Downing, Dr. Knierim's security for the repayment of his loan was changed. He had taken Crippen's note with the agreement and understanding that Crippen was the owner of the tourist camp under purchase contract from Downing. As such, and engaged in the business, Crippen's personal liability was of some value. Without any interest in the tourist camp, out of business, broke and gone, the value of his personal liability on the note was nil. The agreement of Downing to pay the note, while serving as consideration to Crippen in the surrender deal, was also of benefit to Dr. Knierim, and Dr. Knierim's submission to the new situation was sufficient consideration for the agreement by Downing to pay him.

Downing, in making his proof for foreclosure of the lien, ■ merely showed the indebtedness to Benzien and Sons incurred in the erection of the building, their lien for the debt and the assignment to him of the debt and lien. On cross-examination, over objection, he was questioned about his deal with Crippen whereby the property was returned to him and the purchase

contract was surrendered, and also as to the circumstances of the assignment of the lien. Contention is made that such cross-examination was not proper as inquiring into matter not touched upon in direct examination; that thereby he was made defendant's own witness and defendant was bound by his adverse testimony given on such cross-examination.

Downing was suing to enforce the mechanic's lien, and his right to maintain such action was denied and at issue. It was incumbent upon him to prove his right thereto. His relationship to the property resulting from the surrender deal with Crippen, and the circumstances under which he had dealt with Benzien and Sons in taking assignment of the lien were proper matters of inquiry as bearing upon his status in respect to the lien and his right to maintain the action. It was proper cross-examination.

Downing's attempt to foreclose the mechanic's lien was based upon Crippen's ownership of the building as alleged in his complaint. That was not the case. The building had been turned over to Downing and was owned by him, as was found by the trial court. As was further found, Downing had agreed to pay the mortgage debt owing to Dr. Knierim. To this he could have no defense unless it might be that Dr. Knierim had failed fully to perform his agreement to lend money. As we have shown, Dr. Knierim had not refused to make advance of money under the loan agreement while the parties all stood under the tri-party agreement. He was not in default in that respect at the time Downing took back the property, and the failure to advance the balance of the loan after that was due to Downing's actions and not because of any refusal by Dr. Knierim.

Judgment is affirmed.

Mr. Chief Justice Johnson· and Associate Justices Morris· and Adair concur.

Mr. Justice Erickson, deeming himself disqualified, takes no part in the foregoing decision.

Rehearing denied July 2, 1943.